**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW ENGLAND TEAMSTERS PENSION FUND, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, BRIAN MOYNIHAN, and ALASTAIR BORTHWICK,<br><br>Defendants. | Civil Action No.<br><br>DEMAND FOR JURY TRIAL<br><br>CLASS ACTION |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff New England Teamsters Pension Fund ("New England Teamsters" or "Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included a review of the Defendants' (as defined herein) public filings, conference calls, press releases, and announcements, as well as wire and press releases published by and regarding Bank of America Corporation ("Bank of America," together with its subsidiaries, the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a class action brought on behalf of a "Class" of all persons or entities that purchased or otherwise acquired Bank of America common stock between August 1, 2025 and October 13, 2026, inclusive (the "Class Period"). Plaintiff seeks to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Bank of America is a multinational bank holding company that conducts most of its banking business through its wholly owned subsidiary, Bank of America, N.A. ("BANA"). The Company processes hundreds of trillions of dollars in domestic and international transactions annually. Given the scale and nature of its operations, the Company must maintain effective controls to identify, investigate, and report suspicious activity and comply with the Bank Secrecy Act ("BSA"), anti-money laundering ("AML") requirements, and applicable economic sanctions laws. On December 23, 2024, the Office of the Comptroller of the Currency ("OCC"), an agency of the U.S. Department of the Treasury, issued a cease-and-desist order against BANA (the "2024

Consent Order"). BANA consented to the order, which requires it to take comprehensive corrective actions to address deficiencies in its BSA/AML and sanctions compliance programs.

3. This case is about how Defendants misled Bank of America investors by touting the Company's progress in carrying out those required corrective actions while downplaying the scope and financial consequences of its compliance failures. During the Class Period, Defendants portrayed the deficiencies underlying the 2024 Consent Order as "relating to certain aspects" of BANA's processes and claimed that the Company had "already completed significant steps to satisfy requirements of the Consent Order" and did not believe the compliance issues would have a "material adverse financial impact on the Corporation." In reality, the failures were systemic, affected multiple core compliance functions across the Company's business lines, and remained inadequately remediated despite years of internal warnings and regulatory intervention.

4. As a result of these deficiencies, BANA failed to properly monitor trillions of dollars in transactions and timely and accurately report billions of dollars in suspicious activity. Management had received written reports identifying substantial reporting failures years before the Class Period, yet the Company failed to devote sufficient resources to investigating suspicious transactions and correcting its deficient controls. Fundamental compliance deficiencies persisted after the 2024 Consent Order, exposing the Company to substantial regulatory penalties and requiring significant further investment in remediation, including the hiring of thousands of investigators. Consequently, Defendants' repeated assurances about the limited scope of the Company's compliance issues, its remediation progress, and the expected financial impact lacked a reasonable basis and omitted material adverse facts.

5. The truth began to emerge after the market closed on October 13, 2026, when the U.S. Department of Treasury announced coordinated enforcement actions against BANA resulting

in more than $1.21 billion in penalties and settlements. The Financial Crimes Enforcement Network ("FinCEN") assessed a $1.2 billion penalty, including credit for a $750 million penalty imposed by the OCC, and the Office of Foreign Assets Control ("OFAC") separately announced an $11.6 million settlement. In its order, FinCEN stated that BANA admitted that it willfully violated the BSA and missed or delayed detecting and reporting more than $5 billion in suspicious activity. The OCC further found that, despite the 2024 Consent Order, BANA had failed to complete significant corrective steps and its BSA/AML program remained deficient.

6. The truth continued to emerge the following morning, October 14, 2026, when Bank of America reported its third quarter 2026 results, showing that the regulatory settlement charge reduced diluted earnings per share by $0.17. During the earnings call later that morning, J.P. Morgan analyst Vivek Juneja called the charge "obviously a surprise" and described the fallout as "a reputational and confidence issue." He pressed management to explain why investors should believe the problems were behind the Company given "the risk of more charges or more expenses." Following the enforcement announcements and quarterly results, Bank of America's stock price fell to an intraday low of $49.26 on October 14, 2026, before closing at $51.39, **down 4.8%** from the previous day's closing price of $53.96.

7. As a result of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of Bank of America common stock, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC") (17 C.F.R. § 240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The Company conducts substantial business in this District through its local offices and branches, including its One Bryant Park office, a major operational hub housing its Global Wealth & Investment Management, Global Banking, and Global Markets businesses. Bank of America's common stock also trades on the New York Stock Exchange ("NYSE"), located in this District.

11. In connection with the acts, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## III. PARTIES

12. Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased Bank of America common stock during the Class Period and was damaged as a result of Defendants' wrongdoing alleged in this complaint.

13. Defendant Bank of America is a Delaware corporation headquartered in Charlotte, North Carolina. Bank of America's common stock trades on the NYSE under the ticker symbol "BAC." Bank of America conducts its banking operations primarily through its subsidiary, Bank of America, N.A.

14. Defendant Brian Moynihan ("Defendant Moynihan") was at all relevant times Bank of America's Chair of the Board and Chief Executive Officer.

15. Defendant Alastair Borthwick ("Defendant Borthwick") was at all relevant times Bank of America's Executive Vice President and Chief Financial Officer.

16. Defendants Moynihan and Borthwick are sometimes collectively, in whole or in part, referred to herein as the "Individual Defendants."

17. The Individual Defendants possessed the power and authority to control the contents of Bank of America's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Bank of America's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Bank of America, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

18. The Company and the Individual Defendants are sometimes collectively, in whole or in part, referred to herein as the "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. The Company's Compliance Failures and the 2024 Consent Order

19. Bank of America conducts its banking operations primarily through BANA. As a national banking association, BANA is required to maintain a Bank Secrecy Act/anti-money laundering ("BSA/AML") compliance program reasonably designed to ensure compliance with the BSA and its implementing regulations. Those requirements include identifying and reporting suspicious transactions and conducting customer due diligence to understand and monitor the risks associated with customer relationships. BANA is also required to maintain sanctions compliance controls to identify transactions and relationships prohibited by applicable economic sanctions.

20. Effective compliance depended on the Company's ability to identify potentially suspicious transactions, escalate them for investigation, and timely report suspicious activity. Transaction-monitoring thresholds determined which alerts were referred for investigation, while adequate staffing and investigative resources were necessary to evaluate those alerts and prepare suspicious activity reports ("SARs"). Accordingly, weaknesses in the Company's monitoring thresholds or investigative resources could prevent suspicious activity from being identified, investigated, and reported.

21. On December 23, 2024, the OCC issued the 2024 Consent Order, which identified deficiencies in BANA's BSA/AML and sanctions compliance programs, including breakdowns in its processes for identifying, evaluating, and reporting suspicious activity. The OCC found that BANA had failed to maintain appropriate thresholds for determining when transaction alerts should trigger investigations, failed to dedicate sufficient resources to investigations, and failed to comply with SAR filing requirements. The OCC also found that BANA had made insufficient progress toward correcting a previously identified deficiency in its customer due diligence processes. BANA consented to the 2024 Consent Order without admitting or denying the OCC's findings.

22. The 2024 Consent Order identified deficiencies extending across the Company's BSA/AML and sanctions compliance functions, including internal controls, governance, transaction monitoring and models, suspicious activity investigation and reporting, due diligence, risk assessments, staffing, internal audit, and training. To address these deficiencies, the order required BANA to establish a board compliance committee within 30 days, propose an independent consultant within 60 days to conduct a comprehensive assessment of its compliance programs, and submit a corrective-action plan within 90 days identifying responsible personnel

and completion timelines. The 2024 Consent Order also required independent historical transaction reviews to determine whether suspicious activity had been appropriately reported.

23. The 2024 Consent Order further required ongoing oversight of the Company's remediation efforts. The compliance committee was required to review implementation of the corrective-action plan at least quarterly. BANA's dedicated BSA Officer was required to prepare progress reports identifying the corrective actions undertaken, their results and status, and outstanding corrective actions and the persons responsible for completing them. These reports were to be submitted to the Board and forwarded to the OCC. Accordingly, compliance with the 2024 Consent Order required sustained corrective action, verification of its effectiveness, and reporting to the Board and regulators concerning both completed work and unresolved deficiencies.

## B. Defendants' False and Misleading Statements

*Q2 2025 10-Q*

24. After the close of trading on July 31, 2025, the day before the Class Period began, Bank of America filed its Quarterly Report on Form 10-Q for the second quarter of 2025 with the SEC. The Form 10-Q, accompanied by certifications signed by Defendants Moynihan and Borthwick, stated in Note 10, Commitments and Contingencies:

> ***Based on current knowledge, and taking into account accrued liabilities, management does not believe that loss contingencies arising from pending matters, including the matters described below and in the prior commitments and contingencies disclosure, will have a material adverse effect on the consolidated financial condition or liquidity of the Corporation.***[1]

[1] Unless otherwise indicated, all bold and italic emphasis in this section is added.

The referenced commitments and contingencies disclosure in Note 12 of the Company's 2024 10-K downplayed the scope and financial consequences of the Company's compliance failures while touting its remediation progress, stating:

> BANA agreed to a Consent Order announced by the Office of the Comptroller of the Currency (OCC) on December 23, 2024, and the Corporation continues to respond to requests for information from other regulators, ***relating to certain aspects of its BSA/AML and Economic Sanctions Compliance Programs (Programs).*** Since late 2023, ***the Corporation has been working with regulators to make changes to its Programs and has already completed significant steps to satisfy requirements of the Consent Order. The Corporation does not believe that these issues relating to the Programs will have a material adverse financial impact on the Corporation.***

25. The second quarter 10-Q also stated: "***There are no material changes from the risk factors set forth under Part 1, Item 1A. Risk Factors of the Corporation's 2024 Annual Report on Form 10-K.***" Those risk factors warned of additional penalties "***[i]f we fail to meet the requirements***" of regulatory orders, without disclosing that BANA was already failing to adequately address the compliance deficiencies underlying the December 2024 Consent Order, stating:

> The terms of settlements, orders and agreements that we have entered into with government entities and regulatory authorities have also imposed, or could impose, significant operational and compliance costs on us with respect to enhancements to our procedures and controls, losses with respect to fraudulent transactions perpetrated against our clients, expansion of our risk and control functions within our lines of business, investment in technology and the hiring of significant numbers of additional risk, control and compliance personnel. ***For example, in December 2024, the OCC issued a Consent Order against BANA relating to certain aspects of BANA's BSA, anti-money laundering and economic sanctions compliance programs, and we continue to respond to requests for information about similar aspects of such programs from other regulators. If we fail to meet the requirements of the regulatory settlements, orders or agreements to which we are subject, or, more generally, fail to maintain risk and control procedures and processes that meet the heightened standards established by our regulators and other government authorities, we could be required to enter into further settlements, orders or agreements and pay additional fines, penalties or judgments, or accept material regulatory restrictions on our businesses.***

*Q3 2025 10-Q*

26. On October 31, 2025, Bank of America filed its Quarterly Report on Form 10-Q for the third quarter of 2025 with the SEC. The Form 10-Q, accompanied by certifications signed by Defendants Moynihan and Borthwick, stated in Note 10, Commitments and Contingencies:

> ***Based on current knowledge, and taking into account accrued liabilities, management does not believe that loss contingencies arising from pending matters, including the matters described below and in the prior commitments and contingencies disclosure, will have a material adverse effect on the consolidated financial condition or liquidity of the Corporation.***

The referenced commitments and contingencies disclosure in Note 12 of the Company's 2024 10-K included the statements concerning the Company's BSA/AML and sanctions compliance programs set forth in ¶ 24 above.

27. The third quarter 10-Q also stated: "***There are no material changes from the risk factors set forth under Part 1, Item 1A. Risk Factors of the Corporation's 2024 Annual Report on Form 10-K.***" Those risk factors, quoted in ¶ 25 above, warned of additional penalties "***[i]f we fail to meet the requirements***" of regulatory orders, without disclosing that BANA was already failing to adequately address the compliance deficiencies underlying the December 2024 Consent Order.

*2025 10-K*

28. On February 25, 2026, Bank of America filed its Annual Report on Form 10-K for the year ended December 31, 2025. The Form 10-K, signed by Defendants Moynihan and Borthwick, contained statements in Note 12, "Commitments and Contingencies," substantially similar to those set forth in ¶ 24 above concerning the scope of the Consent Order, the Company's remediation efforts, and the expected financial impact of its compliance failures.

29. The 2025 Form 10-K revised the risk factor quoted in ¶ 25 above, removing the phrase "If we fail to meet the requirements" and replacing it with "Failure to meet the

requirements." Despite that revision, the Company continued to describe additional penalties as a potential consequence of noncompliance without disclosing BANA's ongoing failure to adequately address the deficiencies underlying the December 2024 Consent Order:

> The terms of settlements, orders and agreements that we have entered into with government entities and regulatory authorities have also imposed, or could impose, significant operational and compliance costs, including enhancements to our procedures and controls, losses with respect to fraudulent transactions perpetrated against our clients, expansion of our risk and control functions within our lines of business, investment in technology and the hiring of significant numbers of additional risk, control and compliance personnel. ***For example, in December 2024, the OCC issued a Consent Order against BANA relating to certain aspects of its BSA, anti-money laundering and economic sanctions compliance programs, and we continue to respond to requests for information about similar aspects of such programs from other regulators. Failure to meet the requirements of such settlements, orders or agreements, or, more generally, the failure to maintain risk and control procedures and processes that meet the heightened standards established by our regulators and other government authorities, could result in further settlements, orders or agreements and additional fines, penalties or judgments, or material regulatory restrictions on our businesses.***

Q1 2026 10-Q

30. On May 1, 2026, Bank of America filed its Quarterly Report on Form 10-Q for the first quarter of 2026 with the SEC. The Form 10-Q, accompanied by certifications signed by Defendants Moynihan and Borthwick, stated in Note 10, Commitments and Contingencies:

> ***Based on current knowledge, and taking into account accrued liabilities, management does not believe that loss contingencies arising from pending matters, including the matters described below and in the prior commitments and contingencies disclosure, will have a material adverse effect on the consolidated financial condition or liquidity of the Corporation.***

The referenced commitments and contingencies disclosure in Note 12 of the Company's 2025 10-K included the statements concerning the Company's BSA/AML and sanctions compliance programs substantially similar to those set forth in ¶ 24 above.

31. The first-quarter 2026 Form 10-Q also stated: "***There are no material changes from the risk factors set forth under Part 1, Item 1A. Risk Factors of the Corporation's 2025***

***Annual Report on Form 10-K.***" Those risk factors, quoted in ¶ 29 above, warned that "***[f]ailure to meet the requirements***" of regulatory orders "***could result in***" additional penalties, without disclosing BANA's ongoing failure to adequately address the deficiencies underlying the December 2024 Consent Order.

*Q2 2026 10-Q*

32. On July 31, 2026, Bank of America filed its Quarterly Report on Form 10-Q for the second quarter of 2026 with the SEC. The Form 10-Q, accompanied by certifications signed by Defendants Moynihan and Borthwick, revised the Company's commitments and contingencies disclosure to acknowledge potential monetary penalties while continuing to downplay the scope of its compliance failures and tout its remediation progress, stating:

> BANA agreed to a Consent Order announced by the Office of the Comptroller of the Currency (OCC) on December 23, 2024, and the Corporation continues to respond to requests for information from other regulators, ***relating to certain aspects of its BSA/AML and Economic Sanctions Compliance Programs (Programs).*** Since late 2023, ***the Corporation has been working with regulators to make changes to its Programs and has already completed significant steps to satisfy requirements of the Consent Order***; however, resolution of the OCC Consent Order and/or other regulatory inquiries may include the payment of monetary penalties and other remedial actions.

33. The second-quarter 2026 Form 10-Q likewise stated: "***There are no material changes from the risk factors set forth under Part 1, Item 1A. Risk Factors of the Corporation's 2025 Annual Report on Form 10-K.***" Those risk factors, quoted in ¶ 29 above, continued to warn that "***[f]ailure to meet the requirements***" of regulatory orders "***could result in***" additional penalties, without disclosing BANA's ongoing failure to adequately address the deficiencies underlying the December 2024 Consent Order.

34. The statements in ¶¶ 24–33 were materially false and misleading when made because Defendants knew or recklessly disregarded, but failed to disclose, that: (i) systemic weaknesses in BANA's BSA/AML program caused it to fail to properly monitor trillions of dollars

in transactions and to miss, delay, or file inaccurate or incomplete suspicious activity reports involving billions of dollars in suspicious activity; (ii) internal reports had documented BANA's BSA/AML deficiencies for years, yet BANA had not adequately remedied them after the 2024 Consent Order; (iii) BANA also had deficiencies in its sanctions compliance program and processed transactions later identified as apparent violations of multiple sanctions programs; and (iv) fixing these deficiencies required significant additional compliance resources and exposed BANA to substantial penalties and costs. These facts rendered Defendants' statements about the scope of BANA's compliance failures, its progress under the 2024 Consent Order, and the expected costs and penalties materially false and misleading.

**C. The Truth Emerges**

35. The truth behind Defendants' misrepresentations began to emerge after the market closed on October 13, 2026, when the U.S. Department of the Treasury announced coordinated enforcement actions against BANA resulting in more than $1.21 billion in penalties and settlements for BSA/AML and sanctions violations. Specifically, FinCEN assessed a $1.2 billion penalty, including credit for a $750 million penalty imposed by the OCC, while OFAC separately announced an $11.6 million settlement concerning apparent sanctions violations.

36. The enforcement actions revealed that BANA's compliance failures were systemic and extended across its business lines. FinCEN found that deficiencies in BANA's primary transaction-monitoring system "necessarily spanned the Bank's various business lines" and were not confined to a particular product or service. The OCC found that, since at least 2019, BANA had failed to properly monitor trillions of dollars in transactions, resulting in missed, late, inaccurate, and incomplete suspicious activity reports involving billions of dollars. Between 2019 and 2023, BANA management, including the then-BSA Officer, had received written reports identifying substantial failures to report suspicious activity. FinCEN further determined that

BANA failed to timely and accurately report more than $5 billion in suspicious transactions, including more than $1 billion implicating national security and other priority illicit finance risks. BANA admitted the facts and violations set forth in FinCEN's order.

37. The enforcement actions also revealed that fundamental compliance deficiencies persisted despite the December 2024 Consent Order and Defendants' assurances concerning BANA's remediation progress. The OCC expressly found that BANA "has not made sufficient progress in addressing its multiple internal control weaknesses since the 2024 Order was issued" and had merely "begun to implement some of the many significant changes needed" to establish an effective and compliant program. The OCC further found that BANA's BSA/AML program remained deficient as of October 13, 2026, with continuing internal-control gaps. Its investigative backlog had peaked at nearly 200,000 cases in 2024, and implementing revised transaction monitoring required the Company to onboard thousands of additional investigators. FinCEN likewise found that management prioritized limiting resource demands over adequate remediation and that BANA likely saved hundreds of millions of dollars in compliance expenditures through its failures.

38. The truth continued to emerge before the market opened on October 14, 2026, when Bank of America reported third quarter 2026 results showing that the $1.2 billion regulatory settlement charge reduced diluted earnings per share by $0.17. During the Company's earnings call later that morning, analysts directly challenged Defendants' prior assurances and questioned whether the Company's compliance problems were truly behind it. UBS analyst Erika Najarian observed that the stock's decline suggested "more than just the results," pointing to "a confidence issue, perhaps deepened by the consent order." Najarian questioned whether the required third-party review would result in additional expenses and asked how management could restore

investor confidence given expenses that had already exceeded expectations. J.P. Morgan analyst Vivek Juneja echoed those concerns, describing the charge as "obviously a surprise" and as "a reputational and confidence issue." Juneja then pressed management for concrete remediation milestones demonstrating that the problems were "actually now truly behind us as opposed to the risk of more charges or more expenses."

39. Following the enforcement announcements and the Company's disclosure of their impact on its third-quarter earnings, Bank of America's stock price fell to an intraday low of $49.26 on October 14, 2026, before closing at $51.39, **down 4.8%** from the previous day's closing price of $53.96.

## V. ADDITIONAL SCIENTER ALLEGATIONS

40. During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

41. The Individual Defendants permitted Bank of America to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of Bank of America common stock.

42. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Bank of America, their control over, receipt, and/or modification of Bank of America's allegedly materially misleading statements and omissions,

and/or their positions with the Company that made them privy to confidential information concerning Bank of America, participated in the fraudulent scheme alleged herein.

43. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Bank of America common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Bank of America's business, operations, and management and the intrinsic value of Bank of America common stock and caused Plaintiff and members of the Class to purchase Bank of America common stock at artificially inflated prices.

## VI. LOSS CAUSATION/ECONOMIC LOSS

44. During the Class Period, as detailed herein, Bank of America and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Bank of America common stock, and operated as a fraud or deceit on Class Period purchasers of Bank of America common stock by misrepresenting the value and prospects for the Company's business and growth prospects. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Bank of America common stock fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Bank of America common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

45. To the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

46. Further, Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) Bank of America common stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Bank of America common stock; and

(e) Plaintiff and other members of the Class purchased Bank of America common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

47. At all relevant times, the market for Bank of America common stock was efficient for the following reasons, among others:

(a) as a regulated issuer, Bank of America filed periodic public reports with the SEC;

(b) Bank of America regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such

as communications with the financial press, securities analysts, and other similar reporting services;

(c) Bank of America was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d) Bank of America common stock was actively traded on the NYSE.

48. As a result of the foregoing, the market for Bank of America common stock promptly digested current information regarding Bank of America from all publicly available sources and reflected such information in Bank of America's stock price. Under these circumstances, all purchasers of Bank of America common stock during the Class Period suffered similar injury through their purchase at artificially inflated prices and the presumption of reliance applies.

**VIII. NO SAFE HARBOR**

49. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker

had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Bank of America who knew that the statement was false when made.

## IX. PLAINTIFF'S CLASS ACTION ALLEGATIONS

50. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a Class consisting of all persons or entities other than Defendants who purchased or otherwise acquired Bank of America common stock during the Class Period, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

51. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

52. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

53. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

54. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of Bank of America common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

55. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants**

56. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57. This Count is asserted against Defendants based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

58. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

59. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's common stock during the Class Period.

60. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

61. Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class,

or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Bank of America personnel to members of the investing public, including Plaintiff and the Class.

62. As a result of the foregoing, the market price of Bank of America common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Bank of America common stock during the Class Period in purchasing Bank of America common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

63. Had Plaintiff and the other members of the Class been aware that the market price of Bank of America common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Bank of America common stock at the artificially inflated prices that they did, or at all.

64. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

65. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Bank of America common stock during the Class Period.

## COUNT II

## Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

66. Plaintiff repeats and realleges the allegations contained in ¶¶ 1-55 as if fully set forth herein.

67. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the scope and severity of Bank of America's compliance failures, the inadequacy of its remediation efforts, and its resulting exposure to significant regulatory penalties.

68. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

69. Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's common stock.

70. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of itself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 16, 2026

**LABATON KELLER SUCHAROW LLP**
*/s/ Francis P. McConville*
Francis P. McConville
Connor C. Boehme
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
fmcconville@labaton.com
cboehme@labaton.com

*Counsel for Plaintiff*

# CERTIFICATION

I, Daniel J. Greene, as Executive Director of New England Teamsters Pension Fund ("New England Teamsters"), hereby certify as follows:

1. I am fully authorized to enter into and execute this Certification on behalf of New England Teamsters. I have reviewed a complaint prepared against Bank of America Corporation ("BAC") alleging violations of the federal securities laws, and authorize the filing of this pleading;

2. New England Teamsters did not purchase BAC common stock at the direction of counsel or in order to participate in any private action under the federal securities laws and any subsequent motion for lead plaintiff appointment as needed;

3. New England Teamsters is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary. New England Teamsters fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4. New England Teamsters' transactions in BAC common stock during the Class Period are reflected in Exhibit A, attached hereto;

5. New England Teamsters sought to serve as a lead plaintiff or representative party in the following class actions filed under the federal securities laws during the last three years:

*In re Agilon Health, Inc. Securities Litigation*, No. 1:24-cv-0297 (W.D. Tex.)
*New England Teamsters Pension Fund v. The Trade Desk, Inc.*, No. 2:25-cv-1936 (C.D. Cal.)
*New England Teamsters Pension Fund v. West Pharmaceutical Services, Inc.*, No. 2:25-cv-2285 (E.D. Pa.)
*Khan v. Lockheed Martin Corporation*, No. 1:25-cv-6197 (S.D.N.Y.)
*New England Teamsters Pension Fund v. Synopsys, Inc.*, No. 3:25-cv-10201 (N.D. Cal.)

6. Beyond its pro rata share of any recovery, New England Teamsters will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this 16th day of October, 2026.

Daniel J. Greene
Executive Director
New England Teamsters Pension Fund

**EXHIBIT A**

**TRANSACTIONS IN BANK OF AMERICA CORPORATION**

| Transaction Type | Trade Date | Shares | Share Price | Cost/Proceeds |
|---|---|---|---|---|
| Purchases | 08/28/2025 | 800.00 | $50.49 | -$40,392.00 |
| Purchases | 08/28/2025 | 3,900.00 | $50.49 | -$196,911.00 |
| Sales | 09/19/2025 | -1,200.00 | $52.25 | $62,700.00 |
| Purchases | 09/29/2025 | 300.00 | $52.42 | -$15,726.00 |
| Purchases | 09/29/2025 | 2,000.00 | $52.42 | -$104,840.00 |
| Purchases | 09/29/2025 | 800.00 | $52.42 | -$41,936.00 |
| Purchases | 09/29/2025 | 1,100.00 | $52.42 | -$57,662.00 |
| Purchases | 10/27/2025 | 2,400.00 | $53.02 | -$127,248.00 |
| Purchases | 10/27/2025 | 1,700.00 | $53.02 | -$90,134.00 |
| Purchases | 11/14/2025 | 1,100.00 | $52.61 | -$57,871.00 |
| Purchases | 11/28/2025 | 1,800.00 | $53.65 | -$96,570.00 |
| Purchases | 11/28/2025 | 1,000.00 | $53.65 | -$53,650.00 |
| Purchases | 12/09/2025 | 100.00 | $53.54 | -$5,354.00 |
| Purchases | 12/09/2025 | 800.00 | $53.54 | -$42,832.00 |
| Purchases | 12/18/2025 | 7,600.00 | $54.26 | -$412,376.00 |
| Purchases | 12/18/2025 | 1,400.00 | $54.26 | -$75,964.00 |
| Sales | 12/19/2025 | -1,400.00 | $55.27 | $77,378.00 |
| Purchases | 12/26/2025 | 1,400.00 | $56.17 | -$78,638.00 |
| Purchases | 01/13/2026 | 1,100.00 | $54.54 | -$59,994.00 |
| Purchases | 01/30/2026 | 4,100.00 | $53.20 | -$218,120.00 |
| Purchases | 01/30/2026 | 500.00 | $53.20 | -$26,600.00 |
| Purchases | 02/02/2026 | 400.00 | $53.69 | -$21,474.00 |
| Purchases | 02/02/2026 | 200.00 | $54.03 | -$10,806.00 |
| Purchases | 02/19/2026 | 200.00 | $52.77 | -$10,554.00 |
| Purchases | 02/19/2026 | 900.00 | $52.77 | -$47,493.00 |
| Purchases | 03/02/2026 | 1,600.00 | $49.81 | -$79,696.00 |
| Sales | 06/26/2026 | -1,100.00 | $57.88 | $63,668.00 |
| Sales | 09/18/2026 | -1,000.00 | $57.73 | $57,730.00 |
| Sales | 09/18/2026 | -1,000.00 | $57.73 | $57,730.00 |